The STATE of Ohio, Appellee,

v.

FROST, Appellant.

[Cite as *State v. Frost* (1991), 77 Ohio App.3d 644.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–1245.

Decided Oct. 10, 1991.

Certiorari Denied Oct. 5, 1992
See 113 S.Ct. 133.

*Michael Miller,* Prosecuting Attorney, *Bonnie L. Maxton* and *Kevin Rooney,* Assistant Prosecuting Attorneys, for appellee.

*Dennis W. McNamara,* for appellant.

WHITESIDE, Judge.

Defendant Shawn Duncan Frost appeals from his conviction in the Franklin County Court of Common Pleas of aggravated trafficking in cocaine and raises three assignments of error, as follows:

"I. The trial court erred as a matter of law by overruling defendant's motion to suppress evidence, where the law enforcement officers had seized the defendant with no reasonable and articulable suspicion that defendant was engaged in criminal activity.

"II. The trial court erred as a matter of law by overruling defendant's motion to suppress evidence, where the law enforcement officers had conducted a general investigative search of defendant's person and possessions without probable cause.

"III. The trial court erred as a matter of law by holding that defendant's consent to a search can be inferred from defendant's silence or inaction or from defendant's lack of resistance to the search."

Defendant was arrested at the Columbus International Airport after police officers searched him and discovered a package containing cocaine in his right front pocket during a pat-down search. The prosecution contends that defendant was never seized within the contemplation of the Fourth Amendment and that the search was consensual. Defendant, on the other hand, contends that he was detained of his liberty by the police and that, although he consented to a search of his luggage, he did not consent to a search of his person or of the package which was discovered by the police during the pat-down search of his person.

Although we find no decision or entry in the record so ruling, the trial court apparently overruled defendant's motion to suppress, following which defendant entered a no contest plea to the indictment, defense counsel indicating that the decision to enter a no contest plea was predicated upon the court's decision overruling the motion to suppress.

Although there are three assignments of error, at most two issues are presented. The first is whether the law enforcement officers seized defendant without reasonable and articulable suspicion that defendant was engaged in criminal activity. The second is whether the officers engaged in a general investigatory search of defendant's person and possession, in violation of his constitutional rights. The third assignment of error is interrelated with the second, since it contends that consent to search was by silence, rather than by express communication by defendant. The assignments of error being so interrelated and depending in large measure upon the issue of whether defendant consented to the search, we will discuss them together.

The police received a tip from a known informant, who had previously furnished information, that Bryan Stoops had bought two first-class round-trip airplane tickets, one for him and one for defendant, to Miami, Florida, paying $1,000 in cash, mostly $20 bills for the tickets, and that the flight was to leave at 6:55 p.m., Friday, May 4, 1990, and to return the next morning at 11:05 a.m. The informant was not a paid informant, nor a police officer, nor an employee of the city, but had furnished tips previously to the police. The informant did not indicate that defendant and his companion would be carrying drugs but merely described the ticket purchase and suggested that the police check them out.

The police corroborated the information by finding that Stoops had indeed purchased the tickets as described. They obtained both Stoops' and defendant's driver's license information and ascertained that Stoops lived on a farm

near Urbana, Ohio, and that defendant was from Springfield, Ohio. The Urbana police informed the Columbus police that Stoops was a "known dealer" in marijuana and cocaine, although he had never been arrested or convicted. As a result of this information, undercover police officers observed defendant and Stoops, both dressed casually, board the plane as scheduled, each carrying one piece of carry-on luggage. The police located Stoops' brand-new automobile parked in the airport garage. The undercover officers returned the next morning and observed Stoops and defendant deplane at approximately 11:30 a.m. They were the second and third persons off the plane and wore the same clothes and carried the same luggage as the night before.

One of the officers, a detective, testified at trial as to what occurred. He testified that defendant and Stoops fit the drug-courier profile, which consists in part of persons, generally males in their late twenties; usually flying to Miami and paying for plane tickets with cash using small denomination bills; travelling light; dressed casually; taking round-trip flights of very short duration; and either among the first or last persons off the plane on arrival. As they leave the plane and the airport, they usually walk quickly and look around to see if anyone is following them and do not mingle in the airport but, instead, go straight to their automobiles.

Defendant and Stoops did not go straight to the automobile but, instead, stopped in the rest room first. Two plainclothes detectives, including the one who testified, followed them. When they were about halfway through the one hundred fifty-foot long tunnel to the parking lot, one of the officers asked defendant and Stoops if they would talk to the officers because defendant and Stoops displayed some of the attributes of drug couriers. Neither detective displayed a gun, but the testifying detective had one in his pocket, and the one who asked defendant and Stoops to stop had a gun in her purse. Two other plainclothes officers were stationed at the ends of the tunnel but were not conspicuous. In addition, uniformed security guards were visible at both ends of the tunnel but did not participate in the stop.

When defendant was asked why he visited Miami, he replied that he went to attend a friend's wedding, even though they had not arrived in Miami until almost midnight and departed for the return to Columbus about 6:30 a.m. the next morning. Both defendant and Stoops consented to the police searching their carry-on luggage. Nothing was found. Defendant was then asked if he would consent to a pat-down search, and he did. The police officer noticed an object in defendant's right front pocket and asked defendant what it was. Defendant replied that it was cigars. The officer then stated that he would

have to examine them to see if they were cigars. He removed the paper from defendant's pocket and unwrapped it and identified it as cocaine.

The initial testimony as to defendant's consent to the removal of the package from his pocket and the opening of the package is unequivocal. The officer first testified on direct examination, as follows:

"Q. Did you ask him to examine them to see if they were cigars?

"A. Yes.

"Q. What was his reply?

"A. No problem. So I pulled out that object, which was in his pocket, and it was something wrapped in plastic which right away, based on what I have seen in the airport before, and from my experiences, led me to believe that maybe there was something more to this than cigars, due to the way it was wrapped and felt.

"So I told Mr. Frost that I have to open the package to see exactly what it was."

At this point, the officer arrested defendant for possession of cocaine.

On cross-examination, however, as to the pat-down search, the officer testified that both defendant and Stoops consented to the search but that " * * * I don't remember exactly what was said, but there was nothing said that we could not do it." The officer further testified that he knew by the feel that the object in defendant's pocket was neither a knife nor a gun but that, before the pat-down search, he told defendant he wanted to pat him down for either drugs or contraband. Then we have the somewhat troublesome question and response on cross-examination:

"Q. You did not say to him, may I examine the object in your pocket? You said you have to check it?

"A. I did."

The duplicity in the question leaves uncertainty as to whether the police officer meant he asked defendant for permission to examine the object in his pocket. As to opening the package, however, the police officer indicated that he did not ask permission but told defendant that he would have to open the package to inspect it to see what was in it. On further cross-examination, the officer admitted that he was not making the pat-down search because he was looking for a weapon but, instead, as he told the defendant in requesting him to subject to the pat-down search, the search was for drugs or contraband. Again, the officer stated on further cross-examination as to the consent: "Maybe words were spoken, I don't know what was said, but there was no denial." A similar procedure was followed with respect to Stoops, except that

a bag found in his jacket pocket was not searched until it was removed to the police office at the airport.

Defendant testified, as did Stoops, that, although they did consent to the search of their luggage and stopped, remained, and did not resist when asked by the police to do so, they did not consent to the search of their person and most important did not consent to the search of the packages found in their pockets. They indicated that they felt that they were restrained of their liberty and had no choice as to what to do because of uniformed police officers they observed standing at each end of the tunnel. They admitted, however, that other passengers were freely walking by.

■ Turning to the issue of whether defendant was "seized" within the contemplation of the Fourth Amendment, we find the evidence amply supports the apparent determination of the trial court that he was not. Defendant and Stoops were walking along when they were asked by a plainclothes police officer, who displayed her badge, to stop and talk to her and her companion officer because they tended to fit a drug-courier profile. There is no indication at that time that defendant or Stoops was under any restraint. Had they refused to stop, there would have been no basis for an arrest. Neither defendant nor Stoops made any effort to leave but voluntarily complied with the request to stop and talk to the police officers, first showing their identification, and then consenting to a search of their luggage. The circumstances become a little more complex and involved when the police requested defendant to submit to a pat-down search for drugs or contraband. The officer testified that defendant consented. Defendant testified that he did not consent but did not object because he felt he had no choice in the matter. We find the evidence supports the trial court's determination that defendant and Stoops were not seized at this point.

Although defendant and Stoops had been asked to stop and answer questions, there is no indication that they were not free to walk on, and they never attempted to do so, nor requested whether they could do so. By defendant's own admission, he was not told by the stopping detectives either that he was under arrest or that he had to stay, or that he could not walk on if he wanted to. Rather, defendant contends this feeling came upon him not because of the conduct of the stopping detectives but because he observed uniformed officers at each end of the tunnel. The trial court was not required to believe defendant's testimony either as to his feelings or that he observed such uniformed officers, there being evidence supporting a conclusion that it would have been difficult for him to have done so under the circumstances. Accordingly, the trial court did not err in failing to find a seizure, and the first assignment of error is not well taken.

■ The second and third assignments of error relate to whether there was a consent to search. Since the evidence permits a finding that defendant consented to the search, both of his person and of the package, the consent was not implied solely from silence. The testimony of the police officer was unequivocal that defendant consented to the pat-down search. Although the officer could not recall the exact method of consent, he did testify that defendant consented to the search of the package, although on cross-examination he indicated he could not recall the actual method of consent but could recall unequivocally that there was no objection. The testimony as quoted above was unequivocal that the officer asked defendant to examine the object in defendant's pocket to see if the contents were, in fact, cigars. He testified that defendant consented to this search. Such consent related not only to removing the object from defendant's pocket but also to examining the contents. We cannot say that the trial court erred or abused its discretion in believing the officer's testimony that defendant consented to this search. The officer's testimony was that defendant consented to the search of the object in his pocket to ascertain if it contained cigars. When it was removed from his pocket, the officer could not ascertain the nature of the contents of the package by only looking at it, and told defendant that it would have to be opened to see what was in it. It was at this point that defendant did not object or expressly consent. However, if the officer's testimony that defendant consented to an examination of the object to ascertain if it contained cigars is believed and accepted, no further consent was necessary for opening the package since it had already been given.

Since we find that there is evidence supporting the trial court's determination that the search was consensual, neither the second nor third assignment of error is well taken.

For the foregoing reasons, all three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JOHN C. YOUNG and REILLY, JJ., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.